1

Alex R. Straus
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
Alex Straus (SBN 321366)
280 S. Beverly Drive, Ste. PH
Beverly Hills, CA 90212
Telephone: (917) 471-1894
astraus@milberg.com

2

3

4

5

6

*Attorney for Plaintiffs and Putative Classes*
*Other Counsel on Signature Page*

7

8

9

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**(Oakland Division)**

10

11

12

**TRACY BARRETT, LAURA**
**HARMAN, MARILYN MOORE-**
**BUICE,** individually and on behalf of
themselves and all others similarly situated,

13

14

15

        Plaintiffs,

16

v.

17

**THE CLOROX COMPANY, BURT'S**
**BEES, INC., and THE BURT'S BEES**
**PRODUCT COMPANY**,

18

19

        Defendant.

20

21

Case No.: _____

**Jury Trial Demanded**

**CLASS ACTION COMPLAINT**

22

23

24

25

26

27

28

## CLASS ACTION COMPLAINT

Plaintiffs Tracy Barrett, Laura Harman, and Marilyn Moore-Buice ("Plaintiffs") bring this Class Action Complaint against Defendants The Clorox Company, Burt's Bees, Inc. and The Burt's Bees Products Company (collectively "Burt's Bees" or "Defendants"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE ACTION

1.      This is a civil class action brought by Plaintiffs on behalf of all consumers who purchased certain Burt's Bees Lip Products, which are marketed as clean and natural beauty products for normal, everyday use, but which Plaintiffs' independent laboratory testing has confirmed contain harmful per- and polyfluoroalkyl substances ("PFAS") (collectively "PFAS Products" or "Products").[1]

2.      The Burt's Bees brand differentiates itself in the highly competitive beauty and lip care market by uniformly advertising its products as containing "ingredients from nature," using "responsible sourcing," and which are "consciously crafted with ingredients from nature to nourish and revitalize your skin."[2] In fact, Defendants represent that they formulate the Products

---

[1] The action concerns all Burt's Bees products that contain PFAS, including but not limited to Lip Shimmer, Lip Shine, Nourishing Mascara, Satin Lipstick, and Matte Stick. As alleged herein, Defendants conceal the inclusion of PFAS in the Products from consumers. Accordingly, discovery will reveal the exhaustive list of substantially similar Burt's Bees products that are included in this action.

[2] *Values*, BURT'S BEES, https://www.burtsbees.com/values/ (last visited March 10, 2022).

"without… chemicals of concern,"[3]  and with a mission to make "clean conscious skin care more inclusive."[4]

3.    With regard to "Responsible Sourcing,"[5] Burt's Bees commits that they "invest globally in communities that support our supply chain, *helping to safeguard access to clean water*, support the empowerment of women and children, and *promote health, safety and biodiversity*."[6]

4.    Burt's Bees claims to "hold ourselves to higher standards and are working to elevate standards across our industry for quality and transparency."[7]  In fact, they likewise claims they are instrumental in the development of the "first and only" standard for the definition of natural ingredients[8]:

---

[3] *Id.*

[4] Burt's Bees, *Up Close with Burt's Bees Skin Care, Balm & More, Consciously Made Since 1984*, YOUTUBE (Dec. 1, 2021), https://www.youtube.com/watch?v=-SzdUckYY1U.

[5] *Values*, *supra* note 2.

[6] *2020 Impact Report*, BURT'S BEES 13, https://www.burtsbees.com/on/demandware.static/-/Sites-burtsbees-Library/default/dwcf002a3d/redesign/about-us-landing/313081_BB_CORP_SustReport2020_21.02.05.pdf (last visited March 10, 2022) (emphasis added).

[7] *Id.* at 18.

[8] *Id.* at 18. ISO 16128 Scope states that "[t]his document describes approaches to calculate natural, natural origin, organic and organic origin indexes that apply to the ingredient categories defined in ISO 16128-1. This document also offers a framework to determine the natural, natural origin, organic and organic origin content of products based on the ingredient characterization." *Id.*

**ISO 16128 & Natural Origin**

Even with the growth in the natural personal care category, we still lack global regulatory definitions for natural ingredients and products.

We helped advance the development of the first and only international consensus-based guidelines for natural and organic cosmetic products: International Organization for Standardization (ISO) 16128.

We believe ISO 16128 will help provide uniform criteria for the industry and we're applying it across our products to guide our calculation of natural origin percentage, which we have long made a point to include on the front our packaging.

5.      Likewise, Burt's Bees claims their Lip Products are "100% natural," [9] and that "we've made it a priority to clearly state the percentage of ingredients derived from nature on our product labels."[10] The Lip Products packaging likewise claim to be of "100% natural origin."[11]

6.      Similarly, Burt's Bees goes so far as to represent that it is maintains strict supply chain standards, including third-party auditing and involvement in several supply chain programs and other groups. Specifically, Burt's Bees claims they are "*investing in traceable*, *transparent* and resilient *supply chains* to support the livelihoods of the people in the communities where we source our ingredients."[12]

---

[9] *See, e.g., Lip Shimmer*, Burt's Bees, https://www.burtsbees.com/product/lip-shimmer/VM-37499-00-1.html (last visited April 5, 2022).

[10] *Transparency in Natural Beauty*, Burt's Bees, https://www.burtsbees.com/content/new-global-guidelines-for-natural-cosmetics/iso-guidelines.html (last visited March 10, 2022).

[11] *See, e.g., Burt's Bees Lip Shimmer*, Target, https://www.target.com/p/burt-s-bees-lip-shimmer/-/A-14132435 (last visited March 11, 2022).

[12] *Transparency in Natural Beauty*, *supra* note 11.

7.     Reasonable consumers, therefore, fairly and reasonably understand that Burt's Bees products, including specifically its Lip Products, which are marketed as clean, conscious, 100% natural, free of chemicals of concern, and environmentally sustainable (collectively the "Challenged Statements"), would not contain human-made chemicals like PFAS.

8.     As a result of its marketing campaign, over the course of several decades, Burt's Bees brand of Lip Products has unfairly gained the trust of thousands, if not millions, of consumers, who reasonably believe that Burt's Bees products, including the Lip Products, are made without non-clean or non-natural ingredients, such as PFAS. Consumers, including Plaintiffs, relied upon the Burt's Bees reputation and its supporting representations when they purchased the products.

9.     Globally, the clean beauty market is estimated to reach $22 billion by 2024, becoming a fast-growing category within the cosmetics industry.[13] It is no surprise that cosmetic companies, like Defendants, are eager to garner market share in the incredibly lucrative and expanding "clean beauty" movement. In fact, Burt's Bees touts that "more than 22 million households use our products every day."[14]

10.     The clean beauty movement has caused a revolution in the beauty industry, and is the result of increased demand for "clean" products that contribute to the industry's overall health and wellness goals. Over the last 10-15 years, clean beauty products have emerged as key players in the ever-growing cosmetics market, leading companies, such as Defendants, to set themselves apart with attractive marketing claims, even if those claims are unsupported by what is actually in the product.

---

[13] Kristin Larson, *Shopper Demand for Clean Beauty and Increased Transparency Continues*, FORBES (June 30, 2021, 6:47 PM), https://www.forbes.com/sites/kristinlarson/2021/06/30/shopper-demand-for-clean-beauty-and-increased-transparency-continues/.

[14] *2020 Impact Report*, *supra* note 6 at 18.

11.     Defendants know that consumers are focused on what they put on their face – and specifically, their lips, and how the products they use impact the environment.[15]

12.     Consumers pay for Burt's Bees' self-proclaimed clean and 100% natural Lip Products based upon Defendants' pervasive marketing that centers on the importance of using clean and "100% natural" ingredients, which are responsibly sourced, and environmentally sustainable.

13.     Through Burt's Bees' "100% natural ingredient" and "origin" campaign, Defendants capitalize on ever increasing consumer demand for clean beauty products, which are generally understood to have eliminated ingredients shown or suspected to be harmful to human health. This is especially true because, again, Burt's Bees represents that its products are made "without… chemicals of concern."[16]

14.     However, Defendants do not disclose that the Lip Products contain PFAS, a chemical which is entirely inconsistent with its clean beauty, 100% natural, and free of chemicals of concern campaign, the disclosure of which would inevitably impact its sales and standing in the rapidly growing clean beauty market. Defendants' failure to disclose the presence of PFAS in the Lip Products is driven by Defendants' desire to maximize sales revenue.

15.     In reality, Plaintiffs' independent testing has confirmed that the PFAS Products are not manufactured consistent with the Challenged Statements as they contain potentially harmful chemicals.

---

[15] *The Clean Beauty Trend is More Than Skin Deep*, NIELSENIQ (July 29, 2021), nielseniq.com/global/en/insights/education/2021/the-clean-beauty-trend-is-more-than-skin-deep/.

[16] *Id.*

CLASS ACTION COMPLAINT

16.     Plaintiffs likewise tested a large sampling of other Burt's Bees products, including the All Aflutter Mascara, Defining Eyeliner, eye shadow, lip and cheek stick, liquid lipstick, blush, moisturizer, and concealer; however, no PFAS was detected in those products. Thus, Burt's Bees is capable of formulating, sourcing and selling its Lip Products without PFAS.

17.     The presence of PFAS in the Lip Products is inconsistent with the Burt's Bees brand name and its uniform, pervasive clean, 100% natural beauty marketing and advertising campaign, which leads reasonable consumers to believe that the Lip Products do not contain potentially harmful chemicals that pose a risk to humans and the environment. No reasonable consumer would deem the PFAS Products consistent with the Challenged Statements if they knew the Products contain harmful PFAS.

18.     Defendants' misconduct is uniform and widespread. Defendants formulate, design, manufacture, market, advertise, distribute, and sell their Burt's Bees-branded Lip Products containing PFAS to consumers throughout the United States.

19.     Defendants distribute and sell the Burt's Bees line of cosmetics, including the PFAS Products, on its Burt's Bees website, in its Burt's Bees retail stores, and through various authorized brick-and-mortar and online retailers such as Ulta Beauty, Whole Foods, Amazon, Target, CVS, Walgreens, Walmart, and other numerous other retailers.

20.     Defendants do not disclose on their website, in the ingredients, on the packaging, or in any other manner, that the Lip Products contain PFAS; however, Plaintiffs independently tested the Lip Products purchased, and each contained PFAS.

21.     Defendants' concealment of this material information makes its false, deceptive and misleading marketing even more egregious.

22.     Defendants' misrepresentations are intentional, or otherwise entirely careless, and render the PFAS Products worthless or less valuable. If Defendants had disclosed to Plaintiffs and

putative Class Members that the PFAS Products contained PFAS, Plaintiffs and putative Class Members would not have purchased the PFAS Products or they would have paid less for it.

23.    Alternative formulation, designs and materials were available to Defendants at the time it formulated, designed and manufactured the PFAS Products—including that used in its other non-PFAS product—and such alternative formulations and designs were and are used by other manufacturers to produce and sell clean, natural makeup.

24.    Plaintiffs seek damages and equitable remedies for themselves and for the proposed Classes.

## **JURISDICTION AND VENUE**

25.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendants are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

26.    This Court has personal jurisdiction over Defendants because Defendants are headquartered in this District, have substantial aggregate contacts with this District, including engaging in conduct such as misrepresentations and omissions that have a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of California.

27.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendants transact business in this District, and Defendants have intentionally availed itself of the laws and markets within this District.

## DIVISIONAL ASSIGNMENT

28.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d), and 3-5(b), this Action is properly assigned to the Oakland division because a substantial part of the events and omissions which give rise to the claim occurred in Alameda County where Defendants' principal place of business is located.

## PARTIES

29.     Plaintiff Tracy Barrett is a resident and citizen of Fresno, California, who purchased and used the PFAS Products within the relevant time period.

30.     Plaintiff Laura Harman is a resident and citizen of Copemish, Michigan, who purchased and used the PFAS Products within the relevant time period.

31.     Plaintiff Marilyn Moore-Buice is a resident and citizen of Fayetteville, Georgia, who purchased and used the PFAS Products within the relevant time period.

32.     Defendant The Clorox Company is incorporated in Delaware, with its principal place of business located at 1221 Broadway, Oakland, California 94612.

33.     Defendant The Burt's Bees Products Company is incorporated in Delaware, with its principal place of business located at 1221 Broadway, Oakland, California 94612.

34.     Defendant Burt's Bees, Inc. is incorporated in Delaware, with its principal place of business located at 1221 Broadway, Oakland, California 94612.

## FACTUAL ALLEGATIONS

**Burt's Bees Cosmetics**

35.     Founded in the 1980's, Burt's Bees quickly became a household name for clean and natural products, including lip balms and other lip products. Today, Burt's Bees products,

including the PFAS Products, are in "more than 22 million households use our products every day."[17]

36.     Burt's Bees products are sold online, and at mass market beauty retailers, grocery stores, pharmacies, restaurants, and numerous other stores in the United States, including the Burt's Bees website, and other brick-and-mortar and online retailers including Ulta Beauty, Whole Foods, Amazon, Target, CVS, Walgreens, and Walmart.

37.     Defendant The Clorox Company acquired the Burt's Bees brand in 2007 for a reported amount of $925 million.[18]

38.     Before and following this acquisition, Burt's Bees has  represented to consumers that it is committed to nature and environmentally sustainable products. To that end, it represents that it honors the environmental consciousness of its co-founder Roxanne Quimby, and follows in her footsteps by "by using the best ingredients from nature, and in turn respecting nature so we can all live well."[19] In its recent 2020 Impact Report, Burt's Bees re-emphasised that commitment by stating[20]:

> At the very core of Burt's Bees' beliefs is this simple truth: Because we take from nature, we must work to preserve and protect it. We choose the best and most powerful ingredients from nature to formulate our products, so it's incumbent upon us to find ways to give back and preserve nature's incredible diversity, vitality and beauty…   We can reinforce the fact that nature is a remedy through every phase of our work, *from the supply chain to product formulation* to packaging choices to community partnerships.

---

[17] *2020 Impact Report* , *supra* note 6 at 18.

[18] *Clorox to Buy Burt's Bees*, FORBES, https://www.forbes.com/2007/10/31/clorox-burts-bees-markets-equity-cx_af_1031markets15.html?sh=702ea96a79ba (last visited March 11, 2022).

[19] *Our Story*, BURT'S BEES, https://www.burtsbees.com/our-story/ (last visited March 10, 2022).

[20] *2020 Impact Report*, *supra* note 6 at 4 (emphasis added).

39.     From the time of acquisition until the present, Defendants have continued to grow—and profit from—Burt's Bees' well-established position as a leader in the clean, natural beauty market.

40.     Allura reported in 2018, that its lip balm was so popular that it had more than 1,000 5-star ratings on Target's website, and that "[a] tube is sold once every *second*," equating to "86,400 lip balms a day," "600,000 Burt buys per week," and "[a]lmost 31.5 million lip balms sold every year!"[21]

41.     In 2019, it was reported that Burt's Bees had the lionshare of the lip product market, with Burt's Bees having "generated 19.3 percent of lip balm/treatment sales in the United States," exceeding other well-known brands including Chapstick, Carmex, Blistex, Vaseline, and others.[22]

42.     Since its introduction into the consumer marketplace, and continuing since Defendant The Clorox Company's acquisition, the brand's entire marketing focus has centered on promotion of its clean, natural ingredient message.

**PFAS**

43.     PFAS are a category of highly persistent and potentially harmful human-made chemicals.[23]

---

[21] Macaela Mackenzie, *Burt's Bees Beeswax Lip Balm Has More Than 1,000 Five-Star Ratings on Target's Website*, ALLURE (Dec. 15, 2018), https://www.allure.com/story/burts-bees-beeswax-lip-balm-sold-every-second.

[22] *Dollar Sales Share of the Leading Lip Balm/Treatment Brands in the United States in 2019*, STATISTA, https://www.statista.com/statistics/463377/us-dollar-sales-share-of-leading-lip-balm-treatment-brands/ (last visited March 11, 2022).

[23] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited Nov. 27, 2021).

44.     While there are thousands of varieties of PFAS chemicals in existence, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in the environment and in human bodies.[24]

45.     PFAS chemicals are sometimes called "forever chemicals" and have been associated with a variety of negative health effects for humans and the environment.

46.     Humans can be exposed to PFAS through a variety of ways, including ingestion, inhalation, and skin absorption.[25]

47.     According to the FDA, PFAS are "intentionally added" to products such as lotions, cleansers, nail polish, shaving cream, foundation, lipstick, eyeliner, eyeshadow, and mascara "to condition, smooth or make skin appear shiny."[26] PFAS are also added to cosmetics to increase their durability and water resistance."[27]

48.     By law, all ingredients contained within cosmetics are required to be listed on the product label, in descending order of magnitude.

---

[24] *Per- and Polyfluoroalkyl Substances (PFAS)*, NATIONAL TOXICOLOGY PROGRAM, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last visited Nov. 27, 2021).

[25] *Id.*

[26] Sandee LaMotte, *Makeup may Contain Potentially Toxic Chemicals Called PFAS, Study Finds*, CNN (June 15, 2021, 7:46 PM), https://www.cnn.com/2021/06/15/health/makeup-toxic-chemicals-wellness/index.html.

[27] Heather Whitehead et al., *Fluorinated Compounds in North American Cosmetics*, ENVIRON. SCI. TECHNOL. LETT. (June 15, 2021), https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240.

49.     Common    names    for    PFAS    found    in    cosmetics    include    PTFE (polytetrafluoroethylene),    perfluorooctyl    triethoxysilane,    perfluorononyl    dimethicone, perfluorodecalin, and perfluorohexane.

50.     In order to assess the potential health and environmental risk of PFAS in cosmetics, a study was conducted in June 2021 entitled "Fluorinated Compounds in North American Cosmetics" (the "Study"). The Study analyzed more than 231 cosmetic products purchased in the United States and Canada to determine the presence of PFAS.[28]

51.     The Study explained likely reasons for the use of PFAS in makeup[29]:

PFAS are used in cosmetics due to their properties such hydrophobicity and film-forming ability, which are thought to increase product wear, durability, and spreadability. Additional claimed benefits are increased skin absorption of the product and improvements in the appearance or texture of skin.

52.     Despite being required by the US Food and Drug Administration to list all ingredients present in cosmetics, the Study found some 88% of the tested products failed to disclose on their labels any ingredients that would explain those chemical markers.

53.     In order to analyze the presence of PFAS, the Study used a marker for PFAS—the chemical fluorine, which is different than the inorganic fluorine added to drinking water.

54.     "We found fluorine as a surrogate for PFAS was in all sorts of cosmetics. We didn't expect almost every cosmetic to light up like it did," said study author, Graham Peaslee, a professor of physics, chemistry and biochemistry at the University of Notre Dame.[30]

_____

[28] *Id.*

[29] *Id.*

[30] LaMotte, *supra* note 28.

55.     The Study concluded that more than three-quarters of waterproof mascara, nearly two-thirds of foundations and liquid lipsticks, and more than half of eye and lip products had high fluorine concentrations, indicating PFAS were likely present.

56.     In addition, samples from 29 of the products with the highest levels of fluorine were sent to an outside lab for an in-depth analysis that could identify 53 specific PFAS chemicals. The analysis found each of those 29 products contained at least four PFAS chemicals of concern.

57.     In 28 of the 29 products—like the PFAS Products here—PFAS chemicals were not disclosed on the label.

**Risks Associated with PFAS in Cosmetics**

58.     "PFAS in cosmetics may pose a risk to human health through direct and indirect exposure, as well as a risk to ecosystem health throughout the lifecycle of these products."[31]

59.     Of particular concern with PFAS utilized in cosmetics "is that these classes of cosmetics are applied close to the eyes *and the mouth*, which could increase exposure and hence risk due to enhanced absorption and ingestion."[32]

60.     As skin is the body's largest organ,[33] subjecting it to absorption of PFAS through foundation and concealers is very concerning.

61.     A figure utilized in the Study demonstrates how PFAS in cosmetics are introduced to the human body:

---

[31] Whitehead et al., *supra* note 29.

[32] *Id.* (emphasis added).

[33] Gary Swann, *The Skin is the Body's Largest Organ*, J. OF VISUAL COMM. IN MED. (Volume 33, November 19, 2010), https://doi.org/10.3109/17453054.2010.525439.



62.     As one blogger noted, in quoting a notable dermatologist[34]:

Unfortunately, the technological innovations that PFAS helped create also came with a price: Serious health effects. Jennifer Herrmann, MD, FAAD, a board certified, fellowship-trained dermatologist and dermatologic surgeon at Moy Fincher Chipps Facial Plastics / Dermatology, says that PFAS may impact "increased cholesterol, liver inflammation, increased blood pressure in pregnancy, decreased birth rate of children, decreased vaccine response in children, and increased risk of kidney or testicular cancer."

63.     In 2018, Denmark's EPA performed a "Risk assessment of fluorinated substances in cosmetic products." As noted in the assessment:

This project is part of the Danish Environmental Protection Agency's chemical initiative, with the aim of assessing consumers' exposure to problematic chemistry… The purpose of this project is to build knowledge of fluorinated substances in cosmetic products and to clarify whether the use of cosmetic products containing certain fluorinated substances presents a health risk to consumers. The project focuses on perfluoroalkyl and polyfluoroalkyl substances (PFAS), which are also denoted fluoroalkyl substances. PFAS and other fluorinated compounds are used in a variety of cosmetic products such as foundation, moisturizer, eyeshadow, powder, lipstick and shaving cream.

64.     As the study explained, cosmetics are "'leave-on' products, *i.e.*, they are intended to stay on the skin all day, *with a consequently greater exposure expected compared to other*

---

[34] Marie Lodi, *"Forever Chemicals" & Cosmetics: What You Need To Know About PFAS*, ROSE INC, https://www.roseinc.com/blogs/education/pfas-forever-chemicals-cosmetics-makeup-explainer?_pos=1&_sid=6962ca83a&_ss=r (last visited Nov. 27, 2021).

*product types that are intended to be washed off immediately after application* ('rinse-off'

products)" (emphasis added).

65.    The study further noted, "Dermal absorption is set conservatively at 70%. As

mentioned earlier, the value is based on a study (Franko et al., 2012) which showed that

approximately 25% PFOA (as acid) was absorbed through the skin and that 45% of the substance

was retained in the epidermis."

66.    In a 2019 study, the U.S. Department of Health and Human Services' National

Toxicology Program found that PFAS has adverse effects on human organ systems, with the

greatest impact seen in the liver and thyroid hormone.[35]

67.    A figure from the European Environmental Agency ("EEA") shows the "[e]ffects

of PFAS on human health"[36]:

_____

[35] *PFAS Explained*, *supra* note 25.

[36] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



68.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[37]

69.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[38]

---

[37] *Id.*

[38] *What are the health effects of PFAS?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last visited Nov. 27, 2021).

70.     The danger of PFAS chemicals is well known. On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies," reported on the dangers of PFAS—particularly during gestation and in early childhood development[39]:

> Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> More disturbing, PFAS can also alter levels of both mothers' and babies' thyroid hormones, which oversee brain development, growth and metabolism, and also play a role in immunity. Prenatal PFAS exposures that disrupt metabolism and immunity may cause immediate and lasting effects on both mother and child. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, a type of high blood pressure. Their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face increased risk of childhood obesity and infections.

71.     Additionally, according to the EEA:

> Costs to society arising from PFAS exposure are high, with the annual health-related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers, 2019). The study notes that these costs are likely underestimated, as only a limited range of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.

72.     This analysis has yet to be performed in the United States; however, there is no reason to believe the conclusions would differ.

73.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2)

---

[39] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, N.Y. TIMES (Sept. 23, 2020, updated Oct. 18, 2021), https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[40]

**Burt's Bees' Representations**

74.     Defendants are well aware of consumer demand for personal care products that are free from ingredients suspected or known to cause harm to humans and the environment, which is why it has consistently marketed Burt's Bees with the Challenged Statements.

75.     These messages are carried through its in-store marketing, official website and online marketing campaign, including its verified Burt's Bees YouTube channel, including as follows[41]:



76.     Burt's Bees uses the Challenged Statements in every facet of its marketing, including its social media accounts wherein its accounts' "About" pages state[42]:

---

[40] *The Madrid Statement*, Green Science Policy Institute, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (last visited Nov. 27, 2021).

[41] Burt's Bees, *supra* note 4.

[42] Burt's Bees (@burtsbees), Facebook, https://www.facebook.com/burtsbees/ (last visited March 11, 2022); Burt's Bees (@burtsbees), Instagram, https://www.instagram.com/burtsbees/?hl=en (last visited March 11, 2022).



77.    Burt's Bees has more than 3 million Facebook followers and 578,000 Instagram followers that it targets with its representations that the ingredients are "responsibly sourced" from "#nature."

78.    In addition to its overall clean and natural beauty campaign, Defendants further claim that the PFAS Products are 100% natural and free of chemicals of concern, even printing "100% natural origin" on the packaging:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    79.    Further, Burt's Bees also represents with regard to its PFAS Products[43]:

18
19
20
21
22
23
24
25
26
27

28

---

[43] *2020 Impact Report*, *supra* note 6 at 15.

CLASS ACTION COMPLAINT

80.     The Burt's Bees website reinforces its "clean" and "natural" messaging with a substantial portion of the content dedicated to touting its success as a clean brand and a pioneer in the clean beauty industry.[44] The online marketing is directly demonstrative of the reasonable consumer's expectation when purchasing Burt's Bees—a well-calculated result of its pervasive marketing as a "clean," "natural" brand. It is then no surprise that the reasonable consumer expects the Burt's Bees products to be free from potentially harmful ingredients, such as PFAS, as Burt's Bees reinforces that expectation through its pervasive, uniform marketing campaign.

81.     Based upon Burt's Bees' uniform, pervasive marketing messaging utilizing the Challenged Statements, consumers purchase the PFAS Products expecting they will receive just that—a product free from potentially harmful chemicals. Burt's Bees reinforces that message with, among others, the following representations:

      a.   "100% natural" and "100% natural origin;"

      b.   Made "without… chemicals of concern,"

----

[44] *The Madrid Statement*, *supra* note 42..

    c.  "ingredients from nature;"

    d.  "Responsibly sourced;"

    e.  "consciously crafted with ingredients from nature to nourish and revitalize your skin.;"

    f.  "clean conscious skin care;" and

    g.  "We believe in the power of ingredients from nature to nourish and revitalize skin, which is why we work towards high formula standards, industry transformation, and transparency."[45]

82.    Burt's Bees go farther by representing that the products are environmentally conscious, and that they have the strictest supplier standards including:

    a.  "Sustainable Products with Packaging to Match;"

    b.  "We responsibly source the best ingredients from nature to make our products, but we also go the distance to make sure the packages that contain them are as sustainable as possible;"

    c.  "Our product standards reflect our ongoing commitment to the wellbeing of people and the planet;"

    d.  "Responsible Sourcing;"

    e.  "We invest globally in communities that support our supply chain, helping to safeguard access to clean water, support the empowerment of women and children, and promote health, safety and biodiversity;"

    f.  "We've completed more than 100 visits to date to trace and monitor our key raw materials;"[46]

    g.  "We ask tough questions and mentor our suppliers on sustainability improvements; and we do so in order to offer products that truly exemplify The Greater Good®;"

---

[45] *83-Year-Old Cosmetics Law Needs a Makeover*, BURT'S BEES,

https://www.burtsbees.com/content/personal-care-products/safety-act-and-our-actions.html

(last visited March 11, 2022).

[46] *Values*, *supra* note 2.

h.  When evaluating materials related to the "Environment," "We evaluate potential environmental impacts including honeybee health;"[47] and

i.  "Our approach includes:
- Business Partner Code of Conduct
- Supplier Self-Assessments & Site Visits
- Supplier Sustainability Plans
- Third-party Audits
- Ingredient Certification"[48]

83.   It is obvious from the Burt's Bees website, packaging, and other marketing materials that Burt's Bees' campaign that its products, including the PFAS Products, are (1) 100% natural; (2) free of chemicals of concern; (3) consciously formulated; (4) responsibly sourced; and (5) environmentally sustainable, or what has otherwise been referred to as the Challenged Statements, is pervasive and significant.

84.   The obvious implication of these representations is to convince the consumer that Burt's Bees is thoughtful and intentional about not including ingredients in its products that are harmful to humans and the environment.

85.   However, contrary to the Burt's Bees business model and purpose, representations, and consumer expectation of clean products, it sells its Lip Products, which contain PFAS chemicals that are known to be potentially harmful to humans and the environment.

86.   It likewise claims to be instrumental in the development of the ISO standard on natural ingredients and sourcing therefrom: "ISO 16128-2:2017(E): Cosmetics — Guidelines on technical definitions and criteria for natural and organic cosmetic ingredients."

---

[47] *From the Source*, BURT'S BEES, https://www.burtsbees.com/content/responsible-sourcing/responsible-sourcing-asset.html (last visited March 11, 2022).

[48] *Id.*

87.   Burt's Bees likewise goes even further by representing that their "product standards will continue to exceed the criteria outlined by ISO 16128."[49] It expands on those representations by stating[50]:

> ISO 16128 provides clear definitions and a way for us to calculate percent natural origin. Then, we build upon that with our own product standards—ingredients we include and don't, a minimum threshold for percent natural origin—along with all of the practices we've cultivated to over the years to respect and honor the relationship between people and the natural world.

88.   Pursuant to ISO standard, 4.3.2 "Natural origin index = 1: Ingredient meets the definition of natural ingredients, constitutive water, reconstitution water, extraction water or formulation water. Extracts of natural ingredients using ingredient solvents that are natural or derived natural of wholly natural origin (according to ISO 16128-1:2016, Table A.1) have a natural origin index of 1."

89.   Table A.1 identifies this as follows:

**Table 1 — Indexes for the different categories of non-mixture ingredients**

| Ingredient category | Index and value | | | |
|---|---|---|---|---|
| | Natural index | Natural origin index | Organic index | Organic origin index |
| Constitutive water | 1 | 1 | 1b | 1b |
| Reconstitution water | 1 | 1 | 1b | 1b |
| Extraction water, with exclusion of reconstitution water | 1 | 1 | 0 | 0 |
| Formulation water | 1 | 1 | 0 | 0 |

---

[49] *83-Year-Old Cosmetics Law Needs a Makeover*, *supra* note 47.

[50] *Transparency in Natural Beauty* , *supra* note 11.

| Natural | 1 | 1 | 0 | 0 |
|---|---|---|---|---|
| Natural mineral | 1 | 1 | 0 | 0 |
| Organic | 1 | 1 | 1b | 1b |
| Derived naturala | 0 | >0,5 | 0 | 0 |
| Derived organica | 0 | 1 | 0 | To be calculatedb |
| Derived minerala | 0 | 1 | 0 | 0 |
| Non-natural | 0 | 0 | 0 | 0 |

a Annex A shows sample index values and calculations for derived ingredients.
b Only if the source material is organic. Otherwise, the value is 0.

90.     Further, ISO provides for the determination of "natural" content in finished cosmetics products on a range of 0%-100%, with 100% natural being the maximum, or purest natural content:

**5 Approaches to determine natural and/or organic content of finished cosmetic products**

**5.1 Natural content**

**5.1.1 General**

The natural content of a product is the mass percentage, between 0 % and 100 %, of all natural ingredients in that product. It is calculated as the sum of the relative concentrations of a product's ingredients multiplied by their corresponding natural indexes.

91.     Similarly, ISO provides for the determination of "natural" *origin* content in finished cosmetics products on a range of 0%-100%, with 100% natural being the maximum, or purest natural content:

**5.2 Natural origin content**

**5.2.1 General**

The natural origin content of a product is the mass percentage, between 0 % and 100 %, of all natural ingredients and natural portions of derived natural ingredients

in that product. It is calculated as the sum of the relative concentrations of a product's ingredients multiplied by their corresponding natural origin indexes.

92.     As explained by Burt's Bees[51]:



93.     According to the Burt's Bees chart, in order to be a natural ingredient, the ingredient must be "obtained on from plants, animals, micro-biological or mineral sources and not materially altered in processing."

94.     While PFAS could arguably be considered a chemical modification of or application on an ingredient, they could not have the "same chemical compositions as naturally occurring mineral ingredients."

95.     Thus, PFAS are chemicals definitionally excluded from being natural, and any product with these man-made chemicals, can likewise not be of 100% natural origin. Thus, the representations that the PFAS Products are "100% natural" or "100% natural origin," or that they exceed the ISO standards Burt's Bees participated in implementing, are patently false.

---

[51] *Transparency in Natural Beauty*, *supra* note 4.

96.     Reasonable consumers would consider PFAS a harmful chemical and would not expect it would be in the PFAS Products, as evidenced by Defendants' uniform, pervasive marketing campaign aimed at convincing consumers of the Challenged Statements.

97.     Plaintiffs' claims are economic in nature: Plaintiffs and the Classes were injured economically when they purchased the PFAS Products.

98.     As alleged herein, Plaintiffs and the Classes received something worth less than what they paid for and did not receive the benefit of their bargain. They paid for the PFAS Products, which was supposed to be clean and natural, but they received neither.

99.     No reasonable consumer would have purchased, or paid as much, for the PFAS Products had they known the products contained harmful ingredients linked to adverse health effects in humans. Even more egregious, Defendants knew that the Lip Products were manufactured with PFAS, but chose not to disclose this material information to their consumers in an effort to persuade them they were, in fact, buying clean and natural products, rather than products containing potentially harmful chemicals. Instead, they threw consumers off of the scent by representing that the PFAS Products are clean and/or natural.

100.    No reasonable consumer would expect that a product line marketed as free of chemicals of concern would contain an ingredient like PFAS—which scientific studies indisputably link to harmful health effects in humans. Accordingly, Plaintiffs and class members suffered economic injuries as a result of purchasing the PFAS Products.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

101.    Defendants have had actual knowledge for years that the PFAS Products contained potentially harmful chemicals such as PFAS.

102.    Although Defendants was aware of the deception in its labeling given the inclusion of PFAS in its Products, it took no steps to warn  Plaintiffs or Class Members of such PFAS.

103.    Despite its knowledge, Defendants have fraudulently concealed the fact that Products contain PFAS. Defendants had a duty to disclose the existence of the PFAS.

104.    Defendants made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the PFAS Products, including that the PFAS Products are consistent with the Challenged Statements.

105.    Defendants concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the PFAS Products.  Defendants' concealment was knowing, and they intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendants' concealment of these material facts and suffered  injury as a proximate result of that justifiable reliance.

106.    The PFAS in the formulation, design and/or manufacture of the PFAS Products was not reasonably detectible to Plaintiffs and Class Members.

107.    At all times, Defendants actively and intentionally concealed the existence of the PFAS and failed to  inform Plaintiffs or Class Members of the existence of the PFAS. Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

108.    Defendants' statements, words, and acts were made for the purpose of suppressing the truth that the PFAS Products contained harmful chemicals.

109.    Defendants concealed the PFAS for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

110.    As a result of Defendants' active concealment of the PFAS and/or failure to inform Plaintiffs and Class Members of the PFAS, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendants are estopped from

relying on any statutes of limitations in light of its active concealment of the potentially harmful and/or human-made nature of the PFAS Products.

111.    Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Products contained PFAS. Plaintiffs and Class Members had no realistic ability to discern that the Products contained PFAS until they learned of the existence of the PFAS. In either event, Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendants' active concealment of the existence and true nature of the PFAS.

### FED. R. CIV. P. 9(b) ALLEGATIONS
### (Affirmative and By Omission)

112.    Although Defendants are in the best position to know what content was placed on their website(s) and in marketing materials during the relevant timeframe, and the knowledge they had regarding the PFAS and their failure to disclose the existence of PFAS in the Products to consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

113.    **WHO**: Defendants made material misrepresentations and/or omissions of fact through their labeling, website representations, social media, third-party retailers, and marketing statements, which include the Challenged Statements which omitted material information regarding harmful chemicals in the PFAS Products.

114.    **WHAT**: Defendants' conduct here was, and continues to be, fraudulent because they omitted and concealed that the Lip Products contains PFAS, an ingredient that Defendants knew would not be deemed clean or natural by Plaintiffs and Class Members. Defendants' material misrepresentations to this end, include as follows:

   a.   "100% natural" and "100% natural origin;"

   b.   Made "without… chemicals of concern,"

c.   "ingredients from nature;"

d.   "Responsibly sourced;"

e.   "consciously crafted with ingredients from nature to nourish and revitalize your skin.;"

f.   "clean conscious skin care;"

g.   "We believe in the power of ingredients from nature to nourish and revitalize skin, which is why we work towards high formula standards, industry transformation, and transparency."

h.   "Sustainable Products with Packaging to Match;"

i.   "We responsibly source the best ingredients from nature to make our products, but we also go the distance to make sure the packages that contain them are as sustainable as possible;"

j.   "Our product standards reflect our ongoing commitment to the wellbeing of people and the planet;"

k.   "Responsible Sourcing;"

l.   "We invest globally in communities that support our supply chain, helping to safeguard access to clean water, support the empowerment of women and children, and promote health, safety and biodiversity;"

m.   "We've completed more than 100 visits to date to trace and monitor our key raw materials;"

n.   "product standards will continue to exceed the criteria outlined by ISO 16128."

o.   "We ask tough questions and mentor our suppliers on sustainability improvements; and we do so in order to offer products that truly exemplify The Greater Good®;"

p.   When evaluating materials related to the "Environment," "We evaluate potential environmental impacts including honeybee health;" and

q.   "Our approach includes:
   • Business Partner Code of Conduct
   • Supplier Self-Assessments & Site Visits
   • Supplier Sustainability Plans
   • Third-party Audits
   • Ingredient Certification"

Thus, Defendants' conduct deceived Plaintiffs and Class Members into believing that the PFAS Products is clean, natural, responsibly sourced and environmentally sustainable. Defendants knew or should have known this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet they continued to pervasively market its PFAS Products as consistent with the Challenged Statements.

115.   **WHEN**: Defendants made material misrepresentations and/or omissions during the putative Class periods and at the time Plaintiffs and Class Members purchased the PFAS Products, prior to and at the time Plaintiffs and Class Members made claims after realizing the PFAS Products contained harmful chemicals, and continuously throughout the applicable Class periods.

116.   **WHERE**: Defendants' marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of its packaging, its website(s), through marketing materials.

117.   **HOW**: Defendants made material misrepresentations and/or failed to disclose material facts regarding the PFAS Products, including but not limited to the presence of PFAS.

118.   **WHY**: Defendants made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the PFAS Products, the effect of which was that Defendants profited by selling the PFAS Products to many thousands of consumers.

119.   **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the PFAS Products when they otherwise would not have absent Defendants' misrepresentations and/or omissions.

CLASS ACTION COMPLAINT

## PLAINTIFF'S FACTUAL ALLEGATIONS

**Plaintiff Barrett's Experience**

120.    Plaintiff Tracy Barrett purchased the PFAS Products, including Burt's Bees Lip Shimmer.  She purchased the PFAS Products most recently in Winter 2022, at a CVS near her home in Fresno, California.

121.    Plaintiff Barrett was familiar with Burt's Bees, and had previously purchased Burt's Bees products, including the Burt's Bees Lip Shimmer.

122.    Before purchasing the PFAS products, Plaintiff Barrett reviewed the products labels and marketing materials, including the clean and 100% natural representations.

123.    Plaintiff Barrett purchased the PFAS Products based on her belief that the products were clean, natural, and free from harmful chemicals. She wanted a product made from natural ingredients and not harmful chemicals because she wanted to be comfortable reapplying the product frequently. Plaintiff Barrett trusted Burt's Bees advertising and product representations that the PFAS Products consisted of natural ingredients.

124.    Plaintiff Barrett was willing to pay the price she paid for the PFAS Products because she believed their purported "100% natural" and "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

125.    Plaintiff Barrett was specifically drawn to the Burt's Bees product line because of its brand name and clean marketing, which to Plaintiff Barrett meant that the products would be free from harmful chemicals. Plaintiff Barrett has recently recovered from a years-long battle with thyroid cancer. Preceding her diagnosis, and in particular after it, she sought cosmetics products that she believed would support her health and not be potentially harmful to her health. Plaintiff Barrett looked at the product's packaging prior to her purchase, but nowhere on the packaging did

Defendants disclose the presence of PFAS chemicals in the PFAS Products nor did Defendants disclose the products contains harmful chemicals.

126.    If Plaintiff Barrett had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Products, she would not have purchased the PFAS Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

127.    If Plaintiff Barrett could be reassured that Burts-Beest Products no longer contained PFAS, she would consider purchasing the product again.

128.    As a result of Defendants' action, Plaintiff Barrett has incurred damages, including economic damages due to the breaches.  In addition, Defendants' conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

**Plaintiff Harman's Experience**

129.    Plaintiff Laura Harman purchased the PFAS Products, including Burt's Bees Beeswax Lip Balm.  She purchased the PFAS Products most recently in April 2021, at Mesick Pharmacy in Mesick, Michigan.

130.    Plaintiff Harman was familiar with Burt's Bees, and had previously purchased Burt's Bees products, including the Bees Beeswax Lip Balm, Body Lotion, and Nourishing Mascara.

131.    Before purchasing the PFAS products, Plaintiff Harman reviewed the products labels and marketing materials, including the clean and 100% natural representations.

132.    Plaintiff Harman purchased the PFAS Products based on her belief that the products were clean, natural, and free from harmful chemicals.

133.    Plaintiff Harman was willing to pay the price she paid for the PFAS Products because she believed its purported "100% natural" and "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

134.    Following Plaintiff Harman's use of the Burts Bees mascara, she developed shingles, furthering the importance of using makeup products that do not contain potentially harmful chemicals, such as PFAS.  She lives in constant pain due to the consequences of contracting shingles in her eye, which has caused nerve damage in her head. Because of her diagnosis and the pain, she is risk-averse and has stopped using many cosmetics products unless they are natural. Plaintiff Harman looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendants disclose the presence of PFAS chemicals in the PFAS Products nor did Defendants disclose the product contains harmful chemicals.

135.    If Plaintiff Harman had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Products, she would not have purchased the PFAS Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

136.    If Plaintiff Harman could be reassured that Burts-Beest Products no longer contained PFAS, she would consider purchasing the product again.

137.    As a result of Defendants' action, Plaintiff Harman has incurred damages, including economic damages due to the breaches.  In addition, Defendants' conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

**Plaintiff Moore-Buice's Experience**

138.    Plaintiff Marilyn Moore-Buice purchased the PFAS Products, including Burt's Bees Lip Balm.  She purchased the PFAS Products most recently in December 2021, at a CVS near her home in Fayetteville, Georgia.

139.    Plaintiff Moore-Buice was familiar with Burt's Bees, and had previously purchased Burt's Bees products, including the Burt's Bees Lip Balm.

140.    Before purchasing the PFAS products, Plaintiff Moore-Buice reviewed the products labels and marketing materials, including the clean and 100% natural representations.

141.   Plaintiff Moore-Buice purchased the PFAS Products based on her belief that the products were clean, natural, and free from harmful chemicals.

142.   Plaintiff Moore-Buice was willing to pay the price she paid for the PFAS Products because she believed its purported "100% natural" and "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

143.   Plaintiff Moore-Buice was specifically drawn to the Burt's Bees product line because of its brand name and clean marketing, which to Plaintiff Moore-Buice, meant that the products would be free from harmful chemicals. She sought a solution for her chapped lips, but she believed Burt's Bees was a reputable brand with products made from good, clean and 100% natural ingredients. Plaintiff trusted the Burt's Bees brand so much that she would purchase the brand's products to give as gifts to her loved ones. Plaintiff Moore-Buice looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendants disclose the presence of PFAS chemicals in the PFAS Products nor did Defendants disclose the product contains harmful chemicals.

144.   If Plaintiff Moore-Buice had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Products, she would not have purchased the PFAS Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

145.   If Plaintiff Moore-Buice could be reassured that Burts-Beest Products no longer contained PFAS, she would consider purchasing the product again.

146.   As a result of Defendants' action, Plaintiff Moore-Buice has incurred damages, including economic damages due to the breaches.  In addition, Defendants' conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

## **CLASS ACTION ALLEGATIONS**

1
2
3

147.    Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Nationwide Class:

4
5
6

**During the fullest period allowed by law, all persons residing in the United States who purchased the PFAS Products.**

7
8
9
10

148.    Plaintiff Barrett brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following California Class:

11
12

**During the fullest period allowed by law, all persons residing in the State of California who purchased the PFAS Products.**

13
14
15
16

149.    Plaintiff Harman brings this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Michgian Class:

17
18
19

**During the fullest period allowed by law, all persons residing in the State of Michigan who purchased the PFAS Products.**

20
21
22
23

150.    Plaintiff Moore-Buice brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Georgia Class:

24
25

**During the fullest period allowed by law, all persons residing in the State of Georgia who purchased the PFAS Products.**

26
27
28

151.    Specifically excluded from these definitions are: (1) Defendants, any entity in which Defendants have a controlling interest, and its legal representatives, officers, directors,

employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

152.    Plaintiffs reserve the right to modify the class definitions, if necessary, to include additional products with the same PFAS and/or other makeup products manufactured by Defendants with PFAS but bearing different brand names.

153.    **Numerosity**: Class Members are so numerous that joinder of all Members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of tens of thousands of people geographically disbursed throughout United States, and in California, Michigan and Georgia. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. Class Members are readily identifiable from information and records in the possession of Defendants and its authorized distributors and retailers.

154.    **Typicality**: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased the PFAS Products that was formulated, manufactured, marketed, advertised, distributed, and sold by Defendants. Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for the PFAS Products that was manufactured with potentially harmful, human-made chemicals, which makes the PFAS Products not what reasonable consumers were intending to purchase. Furthermore, the factual basis of Defendants' misconduct is common to all Class Members because it engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

155.    **Commonality**: Common questions of law and fact exist as to all Class Members. These questions predominate over questions that may affect only individual Class Members

because Defendants acted on grounds generally applicable to all Class Members. Such common

legal or factual questions include, *inter alia*:

      (a)     Whether the PFAS Products contains PFAS;

      (b)     Whether Defendants' practices in labeling and marketing the PFAS Products tends to mislead reasonable consumers into believing that the PFAS Products is clean and/or natural;

      (c)     Whether the PFAS Products is, in fact, clean and/or natural given that it contains PFAS;

      (d)     Whether Defendants omitted or failed to disclose material information to Plaintiffs and Class Members regarding the PFAS Products;

      (e)     Whether Defendants concealed from and/or failed to disclose to Plaintiffs and Class Members that harmful chemicals are used in its PFAS Products;

      Whether Defendants breached the implied warranty of merchantability relating to the PFAS Products;

      (f)     Whether Defendants' breached express warranties relating to the PFAS Products;

      (g)     Whether Defendants engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the PFAS Products containing harmful chemicals;

      (h)     Whether Defendants engaged in false or misleading advertising by selling and/or marketing the PFAS Products containing harmful chemicals;

      (i)     Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

      (j)     Whether Plaintiffs and Class Members either paid a premium for the PFAS Products that they would not have paid but for the false labeling and marketing of the PFAS Products or would not have purchased them at all;

      (k)     Whether Plaintiffs and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

      (l)     Whether Plaintiffs and the other Class Members are entitled to injunctive, declaratory, or other equitable relief.

156.   **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer and product PFAS class actions, and Plaintiffs intend to prosecute this action vigorously.

157.   **Injunctive/Declaratory Relief**: The elements of Rule 23(b)(2) are met. Declaratory and injunctive relief is appropriate in this matter. Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendants will continue to, or allow its resellers to, advertise, market, promote, and sell the Product in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law.

158.   Plaintiffs have standing to make this claim because they may accidentally purchase another PFAS Products product provided that it was formulated without the PFAS. Defendants have acted and refused to act on grounds that apply generally to the Classes, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Classes as a whole.

159.   Specifically, Plaintiffs seek public injunctive relief to prevent Defendants' fraudulent scheme from defrauding future consumers.

160.   If Defendants are allowed to continue the practices of manufacturing, marketing and selling the PFAS Products with the PFAS, and failing to disclose the PFAS to consumers, unless injunctive or declaratory relief is granted, Plaintiffs and the Classes will not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged herein.

161.    Plaintiffs further seek injunctive and declaratory relief requiring Defendants to cease its unfair, deceptive and unlawful conduct, including the following:

    a.    Undertake an immediate public information campaign to inform consumers the truth about the PFAS, including at the time of sale of the PFAS Products;

    b.    Adequately disclose the PFAS to consumers at the time of sale of the PFAS Products; and

    c.    Remove the PFAS.

162.    Plaintiffs also seeks a declaration that the PFAS Products contains PFAS, which existed at the time of sale of the PFAS Products to consumers, which was known to Defendants and unknown to consumers.

163.    Plaintiffs and Class Members have been harmed and will experience irreparable future harm should Defendants' conduct not be enjoined because they will be unable to properly replace their PFAS Products with clean and natural components or replacement PFAS Products, and will have to bear the costs associated with the PFAS if Defendants continues to fail and refuse to provide adequate remuneration to consumers as a result of the PFAS, which exists at the time of sale of the PFAS Products.

164.    **Predominance and Superiority**: Plaintiffs and Class Members all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of their individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class

treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

165.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

166.    Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes appropriate.

### COUNT I
### Breach of Express Warranty
**(On Behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

167.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-169, and specifically the paragraphs in 42-72 and 73-99 regarding the potentially harmful nature of PFAS and Defendants' deceptive representations, as though fully set forth herein.

168.    Plaintiffs and Class Members purchased the PFAS Products either directly from Defendants or through retailers, such as CVS and Walgreens.

169.    Defendants are and were at all relevant times a "merchant" under U.C.C. § 2-313, and related State U.C.C. provisions.

170.    In connection with its sale of the PFAS Products, Defendants, as the designers, manufacturers, marketers, distributors or sellers, expressly warranted that the PFAS Products were free from harmful chemicals by naming the product line "Burt's Bees."

171.    As detailed herein, Defendants engaged in a uniform, pervasive marketing campaign and expressly warranted to consumers that the PFAS Products conform to the

Challenged Statements, among other substantially similar representations made online, and on its packaging.

172.    The express written warranties covering the PFAS Products were a material part of the bargain between Defendants and consumers. At the time they made these express warranties, Defendants knew reasonable consumers were purchasing the PFAS Products because they believed the products to be as labeled and marketed.

173.    Each of the PFAS Products have an identical or substantially identical product representation(s) as they each contain the product name Burt's Bees.

174.    Defendants breached its express warranties by selling the PFAS Products that were, in actuality, not free harmful chemicals like PFAS, as promised in the labeling and marketing. Defendants breached the warranty because the PFAS Products are not consistent with the Challenged Statements, and which was known to Defendants and unknown to consumers at the time of sale.

175.    Defendants breached their express warranty to products consistent with the Challenged Statements, despite the availability of alternative formulations, designs, materials, and/or options for manufacturing the PFAS Products.

176.    Defendants further breached their express written warranties to Plaintiffs and Class Members in that the PFAS Products contain harmful chemicals at the time they leave the manufacturing plant, and on the first day of purchase, and by failing to disclose and actively concealing this risk from consumers.

177.    The PFAS Products that Plaintiffs and Class Members purchased contained a PFAS chemical that is neither clean nor natural, loss of the product, loss of use of the product, and loss of the benefit of their bargain. Defendants' warranty expressly applies to the original purchaser

and any succeeding owner of the PFAS Products for products purchased within the USA, creating privity between Defendants on the one hand, and Plaintiffs and Class Members on the other.

178.    Likewise, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the PFAS Products and warranties, creating privity or an exception to any privity requirement. Plaintiffs and each of the Class Members are the intended beneficiaries of Defendants' warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the PFAS Products and have no rights under the warranty agreements provided by Defendants. Defendants' warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries of the PFAS Products.

179.    Defendants have been provided sufficient notice of its breaches of the express warranties associated with the PFAS Products.

180.    Upon information and belief, Defendants received further notice and have been on notice of their breach of warranties through their sale of PFAS Products and of their breaches of warranties through customer warranty claims reporting problems with Defendants, consumer complaints at various sources, and their own internal and external testing.

181.    As a direct and proximate result of Defendants' breach of its express written warranties, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT II
### Breach of Implied Warranty
**(On Behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

182.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

183.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class or, in the alternative, the State Subclasses.

184.     Defendants are merchants and were at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the PFAS Products.

185.     The PFAS Products are goods within the relevant laws and Defendants knew or had reason to know of the specific use for which the PFAS Products, as goods, were purchased.

186.     The implied warranty of merchantability included with the sale of the PFAS Products means that Defendants warranted that the PFAS Products would be fit for the ordinary purposes for which the PFAS Products were used and sold, and were not otherwise injurious to consumers, that the PFAS Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Defendants. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendants, and Plaintiffs, and Class Members.

187.     Defendants breached the implied warranty of merchantability because the PFAS Products are not fit for their ordinary purpose of providing reasonably clean, "100% natural," "100% natural original," environmentally sustainable," free of "chemicals of concern," Lip Products for consumers, *inter alia*, the PFAS Products contains potentially harmful chemicals which could reasonably be characterized as clean or natural.

188.     The aforementioned problems associated with the PFAS Products constitute non-clean, unnatural, not responsibly sourced, or environmentally sustainable makeup products, and therefore, there is a breach of the implied warranty of merchantability.

189.     Defendants' warranty expressly applies to the original purchaser and any succeeding owner of the PFAS Products, creating privity between Defendants on the one hand, and Plaintiffs and Class Members on the other.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

190.     Nonetheless, privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendants' warranties and its sale through retailers. Defendants' retailers were not intended to be the ultimate consumers of the PFAS Products and have no rights under the warranty agreements. Defendants' warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were their intended beneficiaries.

191.     More specifically, Defendants' intention that its warranties apply to Plaintiffs and Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the PFAS Products and warranties.

192.     Defendants impliedly warranted that the PFAS Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Makeup manufactured, supplied, distributed, and/or sold by Defendants were clean, "100% natural," "100% natural original," environmentally sustainable," and free of "chemicals of concern;" and (ii) a warranty that the PFAS Products would be fit for their intended use while they were being used by consumers.

193.     Contrary to the applicable implied warranties, the PFAS Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with clean and natural makeup. Instead, the PFAS Products suffered, and continues to suffer, from a formulation, design and/or manufacture, as alleged herein.

194.     Defendants breached the implied warranties because the PFAS Products were sold with the PFAS, which substantially reduced and/or prevented the PFAS Products from being clean and natural.

195.   As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

<u>**COUNT III**</u>
**Negligent Misrepresentation**
**(On behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

196.   Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

197.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class or, in the alternative, the State Subclasses.

198.   Pursuant to California law, Plaintiffs must prove the following for a negligent misrepresentation claim: (1) a false statement of a material fact; (2) Defendant's knowledge that the statement was false; (3) Defendant's intent that the statement induce plaintiffs to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.

199.   As a seller of the PFAS Products and a merchant, Defendants had a duty to give correct information to Plaintiffs and Class Members regarding the truth and accuracy of the ingredients of the PFAS Products. Defendants had sole possession and control of this information and had a duty to disclose it accurately to Plaintiffs and Class Members.

200.   Defendants represented that the PFAS Products conformed to the Challenged Statements when in reality, studies and testing have shown that they contained potentially harmful ingredients. Defendants knew, or should have known, that the PFAS Products contained non-clean and/or non-natural ingredients.

201.     That the PFAS Products were not consistent with the Challenged Statements was known by Defendants, and unknown to to Plaintiffs and Class Members, and was intended to induce Plaintiffs and Class Members to purchase the PFAS Products. Defendants knew that making these representations would induce customers to purchase its makeup over the makeup of competitors.

202.     The Plaintiffs and Class Members relied upon the Defendants' representations that the PFAS Products was "clean" and "natural" when purchasing the PFAS Products. Further, this reliance was in fact to their detriment because the Plaintiffs and Class Members purchased the PFAS Products with harmful chemicals.

203.     Plaintiffs and Class Members are entitled to all relief the Court proper as a result of Defendants' actions described herein.

## COUNT IV
### Fraud

**(On behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

204.     Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

205.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class or, in the alternative, the State Subclasses.

206.     Defendants knew or should have known that the PFAS Products contained potentially harmful ingredients, including PFAS chemicals.

207.     Defendants provided Plaintiffs and Nationwide Class Members with false or misleading material information and failed to disclose material facts about the true nature of the PFAS Products, including the Challenged Statements.

208.    Defendants had exclusive knowledge of the PFAS Products's ingredients at the time of sale and at all other relevant times. Neither Plaintiffs nor Nationwide Class Members, in the exercise of reasonable diligence, could have independently discovered the true nature of the PFAS Products prior to purchase.

209.    Defendants had the capacity to, and did, deceive Plaintiffs and Nationwide Class Members, into believing they were purchasing products which conformed to the Challenged Statements.

210.    Defendants undertook active and ongoing steps to conceal the presence of PFAS chemicals in the Products. Plaintiffs are not aware of anything in Defendants' advertising, publicity, or marketing materials that disclosed the truth about the PFAS Products, despite Defendants' awareness of the problem.

211.    The facts concealed and/or not disclosed by Defendants to Plaintiffs and Nationwide Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or pay the same price for) the PFAS Products.

212.    Defendants intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiffs and Nationwide Class Members to act thereon.

213.    Plaintiffs and Nationwide Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the PFAS Products.

214.    Plaintiffs and Nationwide Class Members suffered a loss of money in an amount to be proven at trial as a result of Defendants' fraudulent concealment and nondisclosure because they would not have purchased the PFAS Products, or would not have purchased the PFAS Products for the price they did, if the true facts concerning the PFAS Products had been known.

215.     Plaintiffs and Class Members are entitled to all relief the Court proper as a result of Defendants' actions described herein.

**COUNT V**
**Violation of the California Consumer Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, *et seq.***
**(On Behalf of Plaintiff Barrett and the Nationwide Class and, Alternatively, the California Class)**

216.     Plaintiff Barrett hereby adopts and incorporates by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

217.     Plaintiff Barrett brings this claim individually and on behalf of the Nationwide Class or, in the alternative, the California Class.

218.     The conduct described herein took place in the state of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq*.

219.     The CLRA applies to all claims of Plaintiff Barrett and Class Members because the conduct which constitutes violations of the CLRA by Defendants occurred within the State of California.

220.     Plaintiff Barrett and Class Members are "consumers" as defined by Civil Code § 1761(d).

221.     Defendants are a "person" as defined by California Civil Code § 1761(c).

222.     The PFAS Products qualifies as "goods" as defined by California Civil Code § 1761(a).

223.     Plaintiff Barrett and the Class Members' purchases of the PFAS Products are "transactions" as defined by California Civil Code § 1761(e).

224.    As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer unlawful:

    a.   "Representing that goods...have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do no have." Civil Code § 1770(a)(5); and

    b.   "Representing that goods...are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

225.    Defendants engaged in unfair competition and/or unfair or deceptive acts or practices in violation of California Civil Code §§ 1770(a)(5) and (a)(7) when it represented, through its advertising and other express representations, that the PFAS Products had benefits or characteristics that it did not actually have.

226.    As detailed in the body of this Complaint, Defendants have repeatedly engaged in conduct deemed a violation of the CLRA, has made representations regarding the PFAS Products's benefits or characteristics that it did not in fact have, and has represented the PFAS Products to be of a quality that it was not. Indeed, Defendants concealed this information from Plaintiff Barrett and Class Members.

227.    The PFAS Products was not and is not "clean" or "natural" for consumers. As detailed above, Defendants violated the CLRA when they falsely represented that the PFAS Products meet a certain standard or quality.

228.    Defendants further violated the CLRA when they advertised the PFAS Products with the intent not to sell the products as advertised, and knew that the PFAS Products were not as represented.

229.    Specifically, Defendants marketed and represented the PFAS Products, *inter alia*, as being "free of harsh chemicals and unnecessary additives," "clean," and "pure" when in fact the PFAS Products contain PFAS chemicals known to be potentially harmful to humans.

230.   Defendants' deceptive practices were specifically designed to induce Plaintiff Barrett and Class Members to purchase or otherwise acquire the PFAS Products.

231.   Defendants engaged in uniform marketing efforts to reach Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the PFAS Products manufactured by Defendants. Defendants' packaging, advertising, marketing, website, and retailer product identification and specifications contain numerous false and misleading statements regarding the quality and ingredients of the PFAS Products. These include, *inter alia*, the following misrepresentations contained in its advertising, marketing, social media platforms, and website:

- 100% NATURAL ORIGIN
- "100% natural original;"
- "Ingredients from nature"
- "clean conscious skin care"
- "Responsible sourcing"
- "[C]onsciously crafted with ingredients from nature to nourish and revitalize your skin."
- "[W]ithout...chemicals of concern."
- "Our products are made with ingredients from nature with responsible sourcing, no animal testing, and recyclable packaging."
- "Our ingredients—right down to the packaging—are simple, natural, and responsible. We practice what we preach—and we hope to set the example for others to follow. We care deeply for the earth and all its people."
- "Sustainable Products with Packaging to Match;"
- "We choose the best and most powerful ingredients from nature to formulate our products, so it's incumbent upon us to find ways to give back and preserve nature's incredible diversity, vitality and beauty..."
- "We hold ourselves to higher standards and are working to elevate standards across our industry for quality and transparency."
- "We've completed more than 100 visits to date to trace and monitor our key raw materials;"
- "We helped advance the development of the first and only international consensus-based guidelines for natural and organic cosmetic products."
- "Our product standards reflect our ongoing commitment to the wellbeing of people and the planet;"
- "We invest globally in communities that support our supply chain, helping to safeguard access to clean water, support the empowerment of women and children, and promote health, safety and biodiversity;"

- "We ask tough questions and mentor our suppliers on sustainability improvements; and we do so in order to offer products that truly exemplify The Greater Good®."

232.    Despite these representations, Defendants omitted and concealed information and material facts from Plaintiff Barrett and Class Members.

233.    In their purchase of the PFAS Products, Plaintiff Barrett and Class Members relied on Defendants' representations and omissions of material facts.

234.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

235.    In accordance with California Civil Code § 1780(a), Plaintiff Barrett and the Class Members seek injunctive and equitable relief for Defendants' violations of the CLRA, including an injunction to enjoin Defendants from continuing their deceptive advertising and sales practices.

236.    Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff Barrett and Class Members seek an order enjoining Defendants from the unlawful practices described above, a declaration that Defendants' conduct violates the Consumer Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

237.    Plaintiff Barrett and Class Members will amend their Complaint to add claims for monetary damages if Defendants fail to take corrective actions.

**COUNT VI**
**Violations of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff Barrett and the California Class)**

238.    Plaintiff Barrett hereby adopts and incorporates by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

239.    Plaintiff Barrett brings this count on behalf of herself and the California Class.

240.    Defendants are a "person" as defined by Cal. Bus. & Prof. Code § 17201.

53

241.    Plaintiff Barrett and California Class Members who purchased the Defendants' PFAS Products suffered an injury by virtue of buying products in which Defendants misrepresented and/or omitted the PFAS Products's true quality and ingredients. Had Plaintiff Barrett and California Class Members known that Defendants materially misrepresented the PFAS Products and/or omitted material information regarding its PFAS Products and its ingredients, they would not have purchased the PFAS Products.

242.    Defendants' conduct, as alleged herein, violates the laws and public policies of the state of California and the federal government, as set out in the preceding paragraphs of this complaint.

243.    There is no benefit to consumers or competition by allowing Defendants to deceptively label, market, and advertise its PFAS Products.

244.    Plaintiff Barrett and California Class Members who purchased Defendants' PFAS Products had no way of reasonably knowing that the PFAS Products were deceptively packaged, marketed, advertised, and labeled; were not clean, 100% natural and not made without chemicals of concern; and were unsuitable for their intended use. Thus, Plaintiff Barrett and California Class Members could not have reasonably avoided the harm they suffered.

245.    Specifically, Burt Bee's marketed, labeled, and represented the PFAS Products as the Challenged Statements, , when in fact the PFAS Products contains potentially harmful, human made, PFAS chemicals.

246.    The gravity of harm suffered by Plaintiff Barrett and California Class Members who purchased the PFAS Products outweighs any legitimate justification, motive, or reason for packaging, marketing, advertising, and/or labeling the PFAS Products in a deceptive and misleading manner. Accordingly, Defendants' actions are immoral, unethical, unscrupulous, and

offend the established public policies of the state of California and the federal government. Defendants' actions are substantially injurious to Plaintiff Barrett and California Class Members.

247.    The above acts of Defendants in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff Barrett and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendants' PFAS Products, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

248.    As a result of Defendants' unlawful, unfair and fraudulent acts and practices, Plaintiff Barrett on behalf of herself and the California Class, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendants from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendants' wrongful conduct to the fullest extent permitted by law.

## COUNT VII
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of Plaintiff Barrett and the California Class)**

249.    Plaintiff Barrett hereby adopts and incorporates by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

250.    Plaintiff Barrett brings this count on behalf of herself and the California Class.

251.    The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

252.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

253.    It is also unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

254.    Defendants, when they marketed, advertised, and sold the PFAS Products, represented to Plaintiff Barrett and California Class Members that they were Burt Bee's marketed, labeled, and represented the PFAS Products as consistent with the Challenged Statementswhen in fact the PFAS Products contains potentially harmful, human made, PFAS chemicals.

255.    At the time of its misrepresentations, Defendants were either aware that the PFAS Products contained PFAS chemicals and were not clean or natural, or they were aware that they lacked the information and/or knowledge required to make such a representation truthfully.

256.    Defendants concealed, omitted, or otherwise failed to disclose this information to Plaintiff Barrett and California Class Members.

257.    Defendants' descriptions of the PFAS Products were false, misleading, and likely to deceive Plaintiff Barrett and other reasonable consumers.

258.    Defendants' conduct therefore constitutes deceptive or misleading advertising under the FAL.

259.    Plaintiff Barrett has standing to pursue claims under the FAL as she reviewed and relied on Defendants' packaging, advertising, representations, and marketing materials regarding the PFAS Products when selecting and purchasing the PFAS Products.

260.    In reliance on the statements made in Defendants' advertising and marketing materials, and Defendants' omissions and concealment of material facts regarding the quality and use of the PFAS Products, Plaintiff Barrett and the California Class Members purchased the PFAS Products.

261.   Had Defendants disclosed the true nature of the PFAS Products, specifically, the presence of PFAS chemicals therein, Plaintiff Barrett and California Class Members would not have purchased the PFAS Products or would have paid substantially less for it.

262.   As a direct and proximate result of Defendants' actions, as set forth herein, Defendants have received ill-gotten gains and/or profits, including but not limited to money from Plaintiff Barrett and California Class Members who paid for the PFAS Products containing PFAS chemicals.

263.   Plaintiff Barrett and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendants by means of its deceptive or misleading representations, including monies already obtained from Plaintiff Barrett and California Class Members as provided for by the Cal. Bus. & Prof. Code § 17500.

<u>COUNT VIII</u>
**Violation Of the Georgia Fair Business Practices Act**
**O.C.G.A. § 10-1-390, *et seq*.**
**(Plaintiff Moore-Buice Individually and Behalf of the Georgia Class)**

264.   Plaintiff Moore-Buice hereby adopts and incorporates by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

265.   The conduct described herein constitutes deceptive acts and practices, which were directed at consumers, and are violations of Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq.* ("FBPA").

266.   Burt's Bees's foregoing deceptive acts and practices, including their omissions, were material, in part, because they concerned an essential part of the Products at issue. Specifically, when Burt's Bees marketed, advertised and sold the PFAS Products, represented to Plaintiff Moore-Buice and Georgia Class Members that the PFAS Products conformed to the Challenged Statements when in fact the PFAS Products contains potentially harmful, human made,

PFAS chemicals. These omissions and representations were material facts to Plaintiffs and Georgia Class Members when selecting the PFAS Products.

267. At the time of its misrepresentations and omissions, Defendants were either aware that the PFAS Products contain PFAS, or were aware that they lacked the information and/or knowledge required to make such a representation truthfully. Defendants concealed, omitted and failed to disclose this information to Plaintiffs and Georgia Class Members.

268. Rather than disclose their knowledge that PFAS was in the Products, Defendants engaged in and continued a widespread uniform, marketing, and advertising campaign that misrepresented the PFAS Products as the Challenged Statements.

269. Defendants' descriptions and advertisements of the PFAS Products were false, misleading, and likely to deceive Plaintiffs and other reasonable consumers.

270. The FBPA declares unlawful any "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." O.C.G.A. § 10-1-393.

271. Included in unlawful conduct under the FBPA is "Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;" O.C.G.A. § 10-1-393(b)(7).

272. Defendants are "persons" as defined by ty O.C.G.A. § 10-1-392.

273. Plaintiff Moore-Buice and Georgia Class Members are consumers as defined by O.C.G.A. § 10-1-392.

274. Defendants' sale of the PFAS Products is a "consumer transaction," and is "trade" and "commerce" as defined by O.C.G.A. § 10-1-392.

275. The PFAS Products are "goods" within the meaning of O.C.G.A. § 10-1-390, *et seq.*

276.    Defendants engaged in unfair and deceptive trade practices through the following conduct:

    a.  Having extensive knowledge of the harmful nature of the PFAS Products and failing to disclose to Plaintiffs and Georgia Class Members;

    b.  Representing the PFAS products were consistent with the Challenged Statements; and

    c.  In failing to disclose to the Plaintiffs and Georgia Class Members that the PFAS Products were inconsistent with the Challenged Statements.

277.    Defendants' conduct caused actual confusion and actual misunderstanding with Plaintiff Moore-Buice and Georgia Class Members, in that they believed they were purchasing and using PFAS Products conforming to the Challenged Statements.

278.    In fact, Defendants' statements were false and misleading in that the PFAS Products are not the Challenged Statements. Had Plaintiff Moore-Buice and Georgia Class Members known Burt's Bees's statements were false or misleading, they would not have purchased the PFAS Products.

279.    As a proximate consequence of Burt's Bees's improper conduct, Plaintiff Moore-Buice and Georgia Class Members were injured, including not receiving the value of the product they purchased and loss of the PFAS Products.

280.    Plaintiff Moore-Buice and Georgia Class Members suffered damages when they purchased the PFAS Products.  Defendants' unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Moore-Buice and Georgia Class Members who were unaware that the PFAS Products contained harmful PFAS chemicals.

281.    Plaintiff Moore-Buice and Georgia Class Members seek all relief available under the law, including injunctive, declaratory relief, and any other relief the Court deems appropriate.

Plaintiff Moore-Buice and Georgia Class Members will amend their Complaint to add claims for monetary damages if Defendants fail to take corrective actions.

<u>**COUNT VIIII**</u>
**Violation of Georgia's Uniform Deceptive Trade Practices Act**
**(O.C.G.A. § 10-1-370, *et seq.*)**
**(Plaintiff Moore-Buice Individually and Behalf of the Georgia Class)**

282.    Plaintiff Moore-Buice hereby adopts and incorporates by reference the allegations contained in paragraphs 1-169 as though fully set forth herein.

283.    Defendants, Plaintiff Moore-Buice, and Georgia Class Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). O.C.G.A. § 10-1-371(5).

284.    The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similar creates a likelihood of confusing or misunderstanding," and representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-372.

285.    By misrepresenting that the PFAS Products are the Challenged Statements and otherwise failing to disclose the nature of the PFAS Products to Plaintiffs and Georgia Class Members, Defendants engaged in deceptive trade practices in violation of the Georgia UDTPA, because Defendants represented that the PFAS Products had characteristics and benefits that they do not have, and represented that the PFAS Products were of a particular standard, quality, or grade when they were of another. See O.C.G.A. §§ 10-1-372(5), (7), (9).

286.    Defendants advertised the PFAS Products as the Challenged Statements with the intent not to sell it as advertised given its knowledge they contained harmful PFAS chemicals, in violation of O.C.G.A. §10-1-372.

287.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm on owners and purchasers of the PFAS Products.

288.    Defendants knew or should have known before Plaintiff Moore-Buice and Georgia Class Members purchased their PFAS Products, that the PFAS Products contained PFAS, were not consistent with the Challenged Statements, and otherwise were not suitable for their intended use.

289.    Defendants had exclusive knowledge of material facts concerning the existence of PFAS in the Products and that the PFAS Products are not as represented; however, Defendants actively concealed the PFAS from consumers by continuing to represent the PFAS Products to be the Challenged Statements.

290.    Defendants were under a duty to Plaintiff Moore-Buice and Georgia Class Members to disclose the PFAS in the Products because, *inter alia*, Defendants were in a superior position to know the true state of facts about the chemicals and ingredients in its Products.

291.    Plaintiff Moore-Buice and Georgia Class Members could not reasonably have been expected to learn or discover that the PFAS Products had PFAS and did not conform to the Challenged Statements.

292.    Despite possessing information to the contrary, Defendants misrepresented the PFAS Products as the Challenged Statements, and otherwise failed to disclose and actively concealed the PFAS while continuing to market and sell the PFAS Products.

293.    Defendants knew or should have known that its conduct violated the Georgia UDTPA.

294.    In misrepresenting the PFAS Products as the Challenged Statements and failing to disclose the the PFAS in the Products, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

295.    The facts Defendants misrepresented to, and concealed from, Plaintiff Moore-Buice and Georgia Class Members were material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase the PFAS Products. Moreover, a reasonable consumer would consider the PFAS in the products to be an undesirable quality, as Plaintiff Moore-Buice and Georgia Class Members did. Had Plaintiff Moore-Buice and Georgia Class Members known that the PFAS Products contained PFAS, they would not have purchased the PFAS Products, or would have paid less for them.

296.    As a result of Defendants' misconduct, Plaintiff Moore-Buice and Georgia Class Members have been harmed and suffered actual damages in that the PFAS Products are not the Challenged Statements.

297.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Moore-Buice and Georgia Class Members have suffered and will continue to suffer actual damages.

298.    Defendants' violation presents a continuing risk to Plaintiff Moore-Buice and Georgia Class Members and the general public, as they continue to make some representations that the PFAS Products consistent with the Challenged Statements.  Defendants' unlawful acts and practices complained of herein affect the public interest.

299.    As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiff Moore-Buice and Georgia Class Members have suffered injury-in-fact and/or actual damage.

300.    Plaintiff Moore-Buice and Georgia Class Members seek an order enjoining Burt's Bees's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

### COUNT X
**Mich. Comp. Laws Ann. §§ 445.903,** *et seq*.
**(Plaintiff Harman Individually and Behalf of the Michigan Class)**

301.    Plaintiff Harman hereby adopts and incorporates by referencethe allegations contained in paragraphs 1-169 as though fully set forth herein.

302.    Plaintiff Harman, the Michigan Class, and Defendants are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

303.    Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

304.    Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

    a.    Representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c); Representing that its goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

    b.    Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

    c.    Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

305.    Defendants' unfair, unconscionable, and deceptive practices include:

    a.    Representing that the PFAS Products were the Challenged Statements, when they contained chemicals harmful to the human body and the environment; and

    b.    Omitting, suppressing, and concealing the material fact that the Products contain harmful PFAS chemicals.

306.   Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the safety and sustainability of the PFAS Products.

307.   Defendants' representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff Harman and Michigan Class Members, that the Products are consistent with the Challenged Statements when they are not.

308.   Defendants intended to mislead Plaintiff Harman and Michigan Class Members and induce them to rely on the misrepresentations and omissions.

309.   Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiff Harman and Michigan Class Members' rights.

310.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, Plaintiff Harman and Michigan Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

311.   Plaintiff Harman and Michigan Class Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any other relief that is just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that this Court:

A.   Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Name Plaintiffs as Class Representatives of the Classes;

C.   Name Plaintiffs' counsel as Class Counsel for the Classes;

D.   Award damages, including compensatory, exemplary, and statutory damages, to

Plaintiffs and the Classes in an amount to be determined at trial;

E.    Permanently enjoin Defendants from engaging in the wrongful and unlawful conduct alleged herein;

F.    Award Plaintiffs and the Classes their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G.    Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H.    Award such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 7, 2022               Respectfully submitted,

*/s/  Alex R. Straus*
Alex R. Straus
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
Alex Straus (SBN 321366)
280 S. Beverly Drive, Ste. PH
Beverly Hills, CA 90212
Telephone: (917) 471-1894
astraus@milberg.com

Rachel Soffin*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049
rsoffin@milberg.com

Harper T. Segui*

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
T: 919-600-5000
hsegui@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

Thomas A. Pacheco*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
15453 Indianola Drive
Derwood, MD 20855
T: 919-600-5000
tpacheco@milberg.com

*Application to be admitted pro hac vice is forthcoming

CLASS ACTION COMPLAINT